IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

## STATE OF TENNESSEE v. DEANGELO LEQUINTE BERRY

**Appeal from the Circuit Court for Montgomery County**
**No. CC17-CR-462  William R. Goodman, III, Judge**

_____

### No. M2020-00250-CCA-R3-CD

_____

The Appellant, DeAngelo LeQuinte Berry, was convicted in the Montgomery County Circuit Court of first degree felony murder and aggravated robbery, a Class B felony, and received a sentence of life plus nine years. On appeal, the Appellant contends that the evidence is insufficient to support the convictions, that the trial court erred by allowing the State to introduce evidence from a cellular telephone and a Facebook account because the evidence was not admissible pursuant to Tennessee Rules of Evidence 403 and 901, that the trial court's failure to grant a mistrial after a witness referred to an assault rifle constitutes plain error, and that the trial court erred by ordering consecutive sentencing. Based upon our review of the record and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT M. MONTGOMERY, JR., JJ., joined.

Gregory D. Smith (on appeal) and Tyler Howard (at trial), Clarksville, Tennessee, for the appellant, DeAngelo LeQuinte Berry.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Dan Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In April 2017, the Montgomery County Grand Jury indicted the Appellant; Robert Michael Gough, Jr.; and Marqus Lorenzo Bryant for the first degree felony murder and

aggravated robbery of Joseph Gordon. The Appellant's codefendants entered into plea agreements with the State, and the Appellant proceeded to trial on July 16, 2018.

At trial, Officer Steven Deering of the Clarksville Police Department (CPD) testified that about 1:00 a.m. on December 23, 2016, he responded to a 911 call at an apartment complex on Royster Lane. When he arrived, he saw a silver car in the parking lot. The car's headlights were on, and the driver's door was open. Officer Deering noticed a trail of blood from the car across the parking lot. He followed the trail to the victim, who was lying on the ground between two cars.

Officer Brandon Hendricks of the CPD testified that he arrived at the apartment complex about the same time as Officer Deering. A man in the parking lot said that he knew the victim and that the victim lived in one of the apartments.

Officer Allen Pendarvis of the CPD responded to the scene and prepared a crime scene sketch. The victim was lying between two vehicles in front of Building 700. The silver car was parked behind Building 300.

Detective Scott Beaubien of the CPD testified that he photographed the crime scene on the morning of December 23. The victim had left a trail of blood as he was "fleeing from his car," and a Ruger P95 handgun was on the driver's floorboard next to the center console. A shell casing and a pair of slippers were in the parking lot. Later that day, Detective Beaubien went to the Circle K "just down the street" from the apartment complex and photographed the gas station. On cross-examination, Detective Beaubien testified that the Ruger was loaded with one round in the chamber and three rounds in the magazine. The police also found a cellular telephone in the victim's car. The telephone was on the floorboard between the driver's seat and the driver's door frame.

Detective Brittany Matos testified that she responded to the crime scene and collected an iPhone and a Ruger P95 nine-millimeter handgun from the victim's car. She collected a .380 caliber shell casing from the parking lot. Detective Matos said that the Ruger was loaded but that she did not know if it was functional. On cross-examination, Detective Matos testified that she collected the victim's wallet from his body. The wallet contained the victim's identification and thirty-three dollars. A dollar bill was in plain view in the center console of the victim's car.

Monique Freeman, the victim's girlfriend, testified that the victim's nickname was "Jojo" or "Scrappy" and that they lived together in December 2016. On the night of December 22, the victim woke Freeman and told her that he needed to borrow her car so that he could go to the gas station "down the street." Freeman knew he meant the Circle K near their apartment. After the shooting, Freeman saw that her car was parked "[i]n front

of another building" of their apartment complex. Freeman acknowledged that the victim sold marijuana but said that she did not know if he carried a weapon. On cross-examination, Freeman testified that the victim was medically retired from the Army and that he knew how to operate a firearm. She acknowledged giving a prior statement in which she said the victim always carried a weapon. The victim carried a weapon for protection.

Thomas Deering testified as an expert in forensic pathology that he performed the victim's autopsy on December 23, 2016. The victim sustained one gunshot wound. The bullet entered the victim's head behind his left ear, and soot was along one edge of the wound, meaning that the end of the gun barrel was "real close" to the victim when the gun was fired. The bullet lacerated the victim's tongue, traveled through his mouth, and exited underneath his right jaw. The bullet grazed the top of his right arm, entered his arm, and came to rest just under the skin. The neck wound caused a large amount of blood loss, and the victim aspirated blood into his lungs. Dr. Deering concluded that the victim's cause of death was a gunshot wound to the neck and that his manner of death was homicide. On cross-examination, Dr. Deering testified that he recovered about $210 from the victim's body.

Investigator Michael Wrey of the CPD testified that on December 23, 2016, he went to the crime scene on Royster Lane and spoke with the victim's girlfriend. Investigator Wrey then went to the Circle K and viewed the store's surveillance video. The video showed that at 1:00 a.m., the victim's car pulled to the side of the store and out of the camera's view. The victim entered the store, bought something, and returned to his car. The victim drove his car to a gas pump and then drove out of the parking lot. Investigator Wrey noticed that a black Dodge Charger had pulled into the lot and had "also parked off in the distance." After the victim's car left the Circle K, the Charger left and traveled in the same direction. The State played the video for the jury.

Officer Justin Long of the CPD testified that on the morning of December 23, 2016, he began looking for a dark-colored Charger. He found the car at an apartment complex on State Line Road. Officer Thomas Walker of the CPD testified that he maintained security on the Charger in the parking lot and that he learned "persons from that vehicle might be in apartment 45." Officer Walker and Sergeant Eric Ewing entered the breezeway of the apartment building and "ran into the owner of the vehicle," who was codefendant Marqus Bryant. Codefendant Robert Gough; Gough's girlfriend, Jayamber Johnson; and Raylonde Bryant were in apartment 45. Raylonde, who was renting apartment 45, gave the officers consent to search the apartment.[1] Officer William King of the CPD testified

---

[1] Because Raylonde Bryant shares a surname with one of the defendants, we will refer to him by his first name for clarity. We mean no disrespect to the witness.

that he processed the Charger on January 5, 2017, and collected samples for DNA and gunshot residue.

Detective Frederick McClintock, III, of the CPD testified that on December 23, 2016, he went to apartment 45 and noticed a strong odor of marijuana. Detective McClintock followed Jayamber Johnson from apartment 45 to her apartment in Oak Grove, and Johnson gave Detective McClintock permission to search her apartment. During the search, he found drug paraphernalia and "some packaging." Based on his training and experience, he thought the packaging was evidence of "previous selling of marijuana." Detective McClintock also found Gough's wallet in the apartment, and the wallet contained a receipt from Tennessee Gun Country. Detective McClintock returned to apartment 45 and photographed the following evidence police found in the apartment: a brown leather holster, a grip for a handgun, "a water bong used to smoke marijuana," an assault-style rifle, two small bags of marijuana, and one larger bag of marijuana. The magazine for the rifle contained .22 caliber rounds. On cross-examination, Detective McClintock testified that the marijuana in apartment 45 weighed forty-eight grams.

David Beta, the owner of Tennessee Gun Country, identified surveillance video showing that on December 19, 2016, the manager of his store "[gave] an individual value on a gun." Beta also identified the store's sign-in log for that date, and one of the names in the log was "Berry." John Griggs, the manager of Tennessee Gun Country, testified that on December 19, 2016, he priced a Ruger SP101 for codefendant Gough. Griggs also priced a "a small pocket pistol .380" for a man who was with Gough. However, due to the condition of that gun, Griggs was not interested in buying it. Later that day, Gough returned to the store, and Griggs purchased the Ruger from him.

Twenty-one-year-old Marqus Bryant testified that he was charged with the Appellant and Gough in this case and that he had been in confinement since December 24, 2016. In exchange for Bryant's truthful testimony against the Appellant, Bryant agreed to to plead guilty to facilitation of first degree murder and receive a sentence of thirteen and one-half years to be served at twenty percent release eligibility.

Bryant testified that in December 2016, he had just returned from military service in Afghanistan and owned a black Dodge Charger. Gough served in the same military unit as Bryant, and they were stationed at Fort Campbell. Bryant "[knew] of" the Appellant but did not know him personally. On the afternoon of December 22, Gough borrowed Bryant's black Charger. About 6:00 p.m., Gough picked up Bryant outside Gate Three at Fort Campbell. They went to Jayambra Johnson's apartment and then to Raylonde Bryant's apartment. Gough wanted "to go buy some more weed, so he could sell [it]" and arranged to buy marijuana from the victim. Gough had never bought drugs from the victim previously. Bryant did not know the victim, so Bryant took a .40 caliber Highpoint pistol

with him for protection. They left Raylonde's apartment about 12:45 a.m. on December 23, and Gough did not have a weapon at that time.

Bryant testified that he drove the Charger and picked up the Appellant, who was known as "Delo." Gough was sitting in the front passenger seat, and the Appellant was sitting in the back seat. Bryant drove to the Circle K and backed into a parking space so he could see the victim's silver car pull into the parking lot. About ten minutes later, the victim arrived and telephoned Gough to find out where Gough was located. Gough told the victim that he was in a black Charger. The victim told Gough to follow him back to his apartment, so Bryant followed the victim to the apartment complex on Royster Lane. The victim pulled into a parking space, and Bryant "backed in" next to him. Gough asked for Bryant's pistol, so Bryant handed the gun to him. Gough got out of the Charger to conduct the drug transaction while Bryant and the Appellant remained in the Charger.

Bryant testified that Gough got into the front passenger seat of the victim's silver Hyundai. Bryant was using his cellular telephone and was not paying attention to what was happening. At some point, though, he noticed that the Appellant got out of the Charger. Bryant heard a gunshot and saw Gough getting out of the Hyundai. Gough was holding the Highpoint pistol, ran back to the Charger, and got into the car. The Appellant also came back to the Charger and got into the back seat. The Appellant was carrying "like a little Walmart bag."

Bryant testified that the Appellant and Gough "got into a heated discussion" because the Appellant had shot the victim. Bryant said Gough stated something like, "'Bro, what is you doing?'" The Appellant responded something to the effect of, "'It is what it is.'" Bryant drove back to Johnson's apartment in Oak Grove and saw that the bag the Appellant had been carrying after the shooting contained marijuana. Gough and the Appellant "split" the marijuana with Gough keeping one half and the Appellant keeping one half. Bryant drove the Appellant back to the location where he had picked up the Appellant earlier, and Bryant and Gough spent the night at Johnson's apartment. Later that day, they returned to Raylonde's apartment, and Gough gave his half of the marijuana to Raylonde. The police found the black Charger parked at Raylonde's apartment.

Bryant testified that he never saw the Appellant with a gun on December 23 and that he did not see the Appellant shoot the victim. After the Appellant was arrested, he and Bryant were in jail together. The Appellant asked Bryant several times "[t]o not place him at the scene."

On cross-examination, Bryant acknowledged that he would be eligible for parole soon. He also acknowledged that he told the police "from the very start that this was just supposed to be a drug deal" but that the police never wanted to know his version of the

story.  The police tried to convince Bryant that the three defendants had planned to rob the victim.

Bryant acknowledged that the Circle K was well-lit and was not a good place to commit a robbery.  The drug buy was supposed to occur at the Circle K, but the victim changed the location.  Bryant had never bought drugs from the victim previously, and the victim's changing the location made Bryant uneasy.  Bryant said that when they arrived at the victim's apartment complex, Gough tried to buy marijuana from the victim.  However, a dispute occurred.  Bryant said that he assumed the dispute was over the price of the marijuana but that he did not know for sure what the dispute was about or what occurred in the victim's car.  Bryant acknowledged telling the police that a "struggle" occurred and that he saw "a lot of hand movement" prior to the shooting.

Bryant testified that during his police interview, the police did not believe his story and thought Gough had planned to rob the victim.  The police accused Bryant of lying and tried to scare him.  At that point in his interview, Bryant had not mentioned that the Appellant was involved.  The police insinuated that Bryant was going to spend the rest of his life in prison, so Bryant decided "to get the best deal" and told the police about the Appellant.  Bryant continued to maintain to the police, though, that the defendants did not plan to rob the victim and that Gough had the gun "just in case for protection."  Bryant finally told the police, "I know that it was supposed to be a drug deal, but if there was something else, I didn't know about it."  The police asked Bryant who he thought shot the victim, and Bryant told them, "'It might have been Delo.'"  Bryant said he thought the Appellant shot the victim because Bryant "couldn't see [Gough] being the one to shoot somebody."

Bryant acknowledged telling the police that Gough, not the Appellant, had the bag of marijuana after the shooting.  Bryant also acknowledged that his memory about the shooting would have been more accurate when he spoke with the police than at the Appellant's trial.  After the shooting, Gough and Bryant smoked some of the marijuana.  Bryant acknowledged that Gough had planned to buy two ounces of marijuana from the victim, which equated to 56.6 grams, and that the police recovered 48 grams of marijuana from Raylonde's apartment.  On redirect examination, Bryant acknowledged that he had consistently maintained that the defendants did not plan to rob the victim, that he did not get out of the Charger during the drug buy, and that he did not know who shot the victim.

Twenty-five-year-old Robert Gough testified that he was charged with Marqus Bryant and the Appellant for the victim's death and that he pled guilty to facilitation of first degree murder in exchange for a fifteen-year sentence to be served at thirty percent.  The plea agreement required his truthful testimony at the Appellant's trial.

Gough testified that he met Marqus Bryant in the military and that he met the Appellant through the Appellant's cousin, Raylonde Bryant. Raylonde Bryant and Marqus Bryant were not related. Gough had known the Appellant about six months at the time of the shooting, and they communicated via cellular telephone. The Appellant was listed in Gough's telephone as "Delo," and the Appellant's telephone number was xxx-xxx-7463.

Gough testified that on December 19, 2016, he went to Tennessee Gun Country to sell his .357 caliber handgun. The Appellant accompanied Gough and talked with the manager about buying the Appellant's .380 caliber handgun. Gough identified surveillance video showing him and the Appellant talking with the manager. Gough said the Appellant used that same .380 to shoot the victim.

Gough testified that on December 22, 2016, he worked at Fort Campbell until noon. He denied borrowing Bryant's black Charger and said he was driving a yellow Charger. About 5:30 p.m., Gough picked up Bryant in the yellow Charger, and they went to Jayambra Johnson's apartment in Oak Grove and then Raylonde's apartment on State Line Road. At some point, Gough picked up the Appellant and drove him to Raylonde's apartment. Gough decided to buy some marijuana so that he could resell it and contacted his seller, who was known as "Tragic." However, Tragic could not meet Gough that night, so Tragic "reached out to [the victim]" to make sure Gough could buy marijuana from the victim. The victim and Gough "came in contact" and planned to meet at the Circle K so that Gough could buy two ounces of marijuana. Gough acknowledged that the victim was listed in Gough's cellular telephone as "Scrap."

Gough testified that he had a .40 caliber handgun and that he, Bryant, and the Appellant left in Bryant's black Charger to meet the victim. Bryant drove, Gough sat in the front passenger seat, and the Appellant sat in the back seat. When they arrived at the Circle K, the victim spoke with Gough on the telephone. The victim thought the Circle K was "a little too hot" because too many people were there and told Gough to follow him to his residence. Bryant followed the victim to the victim's apartment complex. The victim pulled into a parking space, and Bryant pulled into a space beside the victim.

Gough testified that he got into the front passenger seat of the victim's car while Bryant and the Appellant remained in Bryant's car. Gough and the victim got "acquainted a little bit" because they had never met, and the victim showed the marijuana to Gough. They talked about the price of the marijuana, $500, and Gough showed the money to the victim. Gough said that his conversation with the victim was "real cordial" and that the marijuana was in a large freezer bag at the victim's feet. Gough said he saw the Appellant get out of Bryant's Charger, walk to the driver's side of the victim's car, and tap on the victim's window with "[a]n A.R. .22 rifle." Gough did not know the Appellant had the rifle until the Appellant tapped on the window. Gough and the victim held their hands up,

and Gough yelled at the Appellant, "'Delo, what you doing?'" The victim thought Gough was involved, so Gough told the victim, "'I don't have [sh*t] to do with this.'" The Appellant said, "'[F*ck] this. I need this. Grab everything.'" The victim told the Appellant, "'Just take it. You all can have it.'" The Appellant opened the driver's door, pointed the gun at the victim, and pulled the trigger. The rifle did not fire, so the Appellant "threw . . . the .22 away," pulled out "his little .380," and fired one shot.

Gough testified that the victim had a gun on the floorboard next to the marijuana but that the victim never reached for the gun. After the Appellant shot the victim, the Appellant grabbed the bag of marijuana. Gough got out of the victim's car and ran back to the passenger side of Bryant's car. Gough told Bryant to "pull off" before the Appellant could get back into the Charger, but the Appellant opened the back door and got into the back seat. Gough said that he "yelled, cussed" and asked the Appellant "what the hell was he thinking." The Appellant responded, "'[Damn], Cus, did I [f*ck] up?'" Gough told the Appellant, "'Yeah, what you think?'"

Gough testified that Bryant drove back to Johnson's apartment. When they arrived, the Appellant put the bag of marijuana on Johnson's kitchen counter. The Appellant tried to "split" the marijuana with Gough, but Gough told the Appellant that he did not want any "because there was blood on it." Gough told Bryant to get the Appellant out of Johnson's apartment because he did not want anything to do with the Appellant. Gough then went into Johnson's bedroom and cried. When Gough returned to the kitchen, the Appellant was gone, but one half of the marijuana remained. Gough took the marijuana to Raylonde and was at Raylonde's apartment when the police found Gough. The police searched Raylonde's apartment and found the marijuana. Gough spoke with the police but initially did not tell them anything about the Appellant's involvement because Gough did not want to be a "snitch." Gough said that he never used the handgun he had with him on the night of the shooting and that he later left the gun at Raylonde's apartment.

On cross-examination, Gough acknowledged that he was "going to spend way less time in jail thanks to that [plea] deal." He also acknowledged that he insisted to the police that the victim's shooting was "a drug deal that [went] wrong." Gough was surprised when the police charged him with first degree murder because he did not shoot the victim. The police did not threaten Gough but said he would spend the rest of his life in jail. Gough denied that the police scared or coerced him.

Gough testified that he did not have the handgun on his person when he got into the victim's car. Bryant had the gun because Gough had left the gun in the black Charger, and Gough did not know why Bryant had claimed Gough was holding the gun after the shooting. The police asked Gough twice who killed the victim, and Gough told them both times, "I don't know." When the police asked Gough for the third time who killed the

victim, Gough told them, "Delo." Gough said he initially lied to the police about the Appellant's involvement because Gough was "scared about . . . 'snitching.'"

Gough acknowledged that his police interview was video recorded. During the interview, the officer left the room, and Gough could be heard saying to himself, "'Better him than me.'" Gough also said to himself, "'I'm willing to give them everything he wants to know.'" Gough acknowledged that he lied during his interview. For example, Gough denied to the police that he sold marijuana. Gough said that just prior to the shooting, the Appellant threw the rifle onto the ground. After the shooting, the Appellant picked up the rifle and ran back to Bryant's car. Gough acknowledged that he never told the police the Appellant had a rifle. He said Bryant was lying when Bryant claimed Gough had the bag of marijuana after the shooting.

Shauntay Curtis, the Appellant's sister, testified that she lived in a suburb of Chicago and that she did not want to testify against the Appellant. About Christmas 2016, the Appellant came to visit Curtis. Curtis said, "He told me . . . that they was going to do -- commit a -- a robbery, and that somebody got shot, and that -- he told me that -- he told me that he's the one that -- that shot the person." The Appellant told Curtis that he and "two other guys" were involved, and Curtis assumed the Appellant came to Chicago to hide from the police. Curtis talked with the Appellant about turning himself in to law enforcement, but the Appellant "wasn't going to." On cross-examination, Curtis acknowledged that after the Appellant told her about the shooting, the two of them "sobbed together."

Raylonde Bryant testified that he used to be in the same military unit as Marqus Bryant and Robert Gough and that the Appellant was his cousin. On the night of December 22, 2016, Bryant and Gough were at Raylonde's apartment. Raylonde said that an "A.R. 15" was in his apartment and that it was his "understanding" the rifle belonged to "Delo." A ".357" and a "Highpoint .40" also were in Raylonde's apartment. The .357 caliber handgun belonged to Gough, and the Highpoint .40 caliber handgun belonged to Raylonde's brother but was "loaned to" the Appellant. The day after the shooting, Gough gave some marijuana to Raylonde and told Raylonde "to put it up." Gough did not say where he got the marijuana. The police later found the rifle, the Highpoint, and the marijuana in Raylonde's apartment.

Raylonde testified that after the Appellant was arrested, the Appellant contacted him and asked him to "[r]each out to [Gough] to get him to change his statement." The Appellant also talked with Raylonde about establishing an alibi defense.

On cross-examination, Raylonde testified that the Appellant was never in Raylonde's apartment on December 22 or 23; therefore, the Appellant could not have taken

the rifle with him to the Circle K. However, Gough took the rifle with him when he left Raylonde's apartment before the shooting. Raylonde identified a transcript of a jailhouse telephone call the Appellant made to him on April 28, 2018. Raylonde acknowledged that according to the transcript, the Appellant told Raylonde, "'Have [Gough] tell them what really happened[.]'"

Elaine Bryant, the Appellant's cousin, testified under subpoena that a few days before Christmas 2016, the Appellant came to her house. The Appellant had marijuana and told Ms. Bryant that "he had to do some crazy stuff to get it." Ms. Bryant said that she and the Appellant were Facebook "friends" and that she also saw "some stuff on his [Facebook] page." Ms. Bryant recognized the Appellant's Facebook page and the messages he posted because his photograph appeared on his page and messages. Ms. Bryant said that she "look[ed] on Facebook again" and that she saw the Appellant "arguing with people, saying, 'Oh, well, it ain't my fault. He's dead now. What you want me to do,' etcetera, etcetera." The State asked Ms. Bryant if she questioned the Appellant about his involvement in the shooting, and she answered, "'Well, I didn't have to ask. I could clearly read it on Facebook.'" Ms. Bryant later asked the Appellant, who had left Tennessee by that time, if he had "anything to do with the situation." The Appellant told Ms. Bryant that "he didn't have nothing to do with it, but things got hectic, that's why he left." The Appellant also told her that "he had to do what he had to do to get the weed." Ms. Bryant denied telling the police that the Appellant claimed he "popped the dude." On cross-examination, Ms. Bryant testified that the Appellant used to come to her house "[a]ll the time" and that he always had marijuana. The Appellant never said anything to Ms. Bryant about a robbery.

Sergeant Gregory Beebe of the CPD testified that he investigated the victim's death and arrived at the crime scene at 2:47 a.m. on December 23, 2016. The next day, Sergeant Beebe went to Raylonde's apartment and searched it. On December 28, Sergeant Beebe learned that Raylonde had found a Highpoint .40 caliber handgun in his apartment, so Sergeant Beebe went to the apartment and collected it.

Sergeant Beebe testified that he searched Gough's cellular telephone and that he found text messages that may have been related to the case. Sergeant Beebe read the text messages from Gough's telephone to the jury, and the State introduced a typed copy of the text messages into evidence. The text messages Gough's telephone exchanged with "Skrapp" were as follows:

| Date | Time | Incoming/Outgoing | Message |
|---|---|---|---|
| 12/22/16 | 11:14 p.m. | Incoming | My name skrapp bro lock me in gimme 5 for it |
| 12/22/16 | 11:32 p.m. | Incoming | Long as it ain't no Bs |

| 12/22/16 | 11:45 p.m. | Incoming | Yea long as business legit |
| 12/23/16 | 12:06 a.m. | Incoming | Yea he just hit me say you solid and that's my mans so you good with me |

The text messages Gough's telephone exchanged with "Delo" were as follows:

| Date | Time | Incoming/Outgoing | Message |
|------|------|-------------------|---------|
| 12/22/16 | 11:41 p.m. | Outgoing | Waiting on his text back |
| 12/22/16 | 11:53 p.m. | Incoming | Nothin? |
| 12/22/16 | 11:56 p.m. | Outgoing | He said yea |
| 12/23/16 | 12:36 a.m. | Outgoing | Come out |

The text messages Gough's telephone exchanged with Marqus Bryant's telephone were as follows:

| Date | Time | Incoming/Outgoing | Message |
|------|------|-------------------|---------|
| 12/24/16 | 8:59 a.m. | Incoming | Aye big bro 12 on our add |
| 12/24/16 | 8:59 a.m. | Incoming | Hide everything right now |
| 12/24/16 | 8:59 a.m. | Outgoing | How ??? Wtf u mean |

On cross-examination, Sergeant Beebe acknowledged that the text messages did not mention a robbery. He also acknowledged that the text messages appeared to be discussing a drug transaction.

Sergeant Eric Ewing of the CPD testified that he was the lead investigator in the case and participated in the search of Raylonde's apartment. The police found marijuana during the search. Sergeant Ewing applied for search warrants for various cellular telephones, including the victim's and the defendants' telephones, and served those warrants on "the various media companies." He also served Facebook with a search warrant for the Appellant's account. Sergeant Ewing received records from cellular telephone providers and Facebook. The Appellant was arrested in Chicago and was returned to Montgomery County. He waived his rights and spoke with Sergeant Ewing but claimed he was in Chicago at the time of the victim's death.

On cross-examination, Sergeant Ewing testified that he developed the Appellant as a suspect by speaking with Gough. Sergeant Ewing denied that he had decided the case involved a robbery before he even spoke with Gough. Sergeant Ewing asked Gough if a robbery had occurred and asked Gough "to explain if him or [Marqus] Bryant were involved in a robbery, to tell the truth." Gough tried to deny a robbery, so Sergeant Ewing

told Gough that he thought the defendants planned to rob the victim and ended up shooting the victim. Gough denied that the defendants planned to rob the victim.

Sergeant Ewing testified that Gough's interview lasted several hours and that Gough lied during the interview. Sergeant Ewing denied threatening Gough but said he told Gough "something about [Marqus] Bryant indicating that [Gough] was in the car with the victim when the victim was shot." The defendants allegedly met the victim to buy two ounces of marijuana, but only 1.69 ounces of marijuana were recovered from Raylonde's apartment. Sergeant Ewing acknowledged that the defendants left "plenty of valuables" in the victim's car after the shooting such as the victim's wallet, money, iPhone, and gun. Sergeant Ewing also acknowledged that the victim's gun was loaded. On redirect-examination, Sergeant Ewing acknowledged that the Appellant received death threats on social media after the shooting and that the Appellant posted responses to some of those threats.

Jessica Hudson of the Tennessee Bureau of Investigation (TBI) testified as an expert in firearm and tool mark identification that she examined the P95 Ruger found in the victim's car and the Highpoint .40 caliber handgun found in Raylonde's apartment. Both of the guns were functional. Hudson also examined the .380 caliber cartridge case found at the scene and a .380 caliber bullet recovered from the victim. Neither was fired from the Ruger or the Highpoint.

Special Agent Forensic Scientist Kyle Osborne of the TBI testified as an expert in microanalysis that the following areas of the black Charger were swabbed for gunshot residue: (1) the interior of the driver's door, (2) the steering wheel, (3) the gear shift, (4) the interior of the driver-side rear door, (5) the interior of the passenger-side rear door, and (6) the interior of the passenger-side front door. Agent Osborne analyzed the swabs and found gunshot residue only on the passenger-side rear door.

Christie Wixson, an analyst with the Regional Organized Crime Information Center, testified that she analyzed the cellular telephone and Facebook records obtained by Sergeant Ewing. At 3:00 p.m. on December 24, the Appellant's cellular telephone was in Clarksville. That evening and into the early morning hours of December 25, the telephone traveled to the Chicago area. Wixson identified Facebook messages sent from the Appellant's account. At 1:36 a.m. on December 23, 2016, the Appellant sent, "Aw. Well I got da loud on deck. 15 a g. 40 a 3.5." At 1:40 a.m., the Appellant sent, "Loud on deck. 15 a g. 40 a 3.5." At 1:41 and 1:49 a.m., the Appellant sent the following message to a group of individuals: "15 a g. 40 a 3.5. New Shipment." At 1:43 a.m., the Appellant sent the following message to an individual: "15 a g. 40 a 3.5. New Shipment." At 4:08 p.m. on December 24, the Appellant sent, "[N*GGAS] SNITCHED!!" On December 25 at 11:04 a.m., the Appellant sent, "They charged dem [n*ggas]."

The State recalled Sergeant Ewing to the stand. Sergeant Ewing testified that high-grade marijuana was commonly referred to as "loud." He said that "15 a g. 40 a 3.5" meant that the Appellant was "selling it for $15 for a gram or $40 for 3.5 grams or an eight ball." At the conclusion of Sergeant Ewing's testimony, the State rested its case.

The Appellant testified that he used to sell marijuana and that he was "running low" on December 22, 2016. His usual supplier was unavailable, so he asked Gough to "hook me up with somebody." The codefendants picked up the Appellant and drove him to buy marijuana from "Scrap." Bryant was in the driver's seat, Gough was in the front passenger seat, and the Appellant was in the rear passenger seat. They went to the Circle K, followed the victim to the apartment complex on Royster Lane, and "backed in" beside the victim's car. Gough got out of Bryant's Charger and got into the victim's car while the Appellant remained in the Charger. The Appellant sent a text message and got out of the Charger. The Appellant had his "[Ruger] 38" in the pocket of his hoodie and walked to the driver's side of the victim's car. The Appellant explained, "I was the one with the money and I was the one who was actually supposed to [be] buying weed from the dude. So, . . . I was just going to introduce myself."

The Appellant testified that the victim opened his driver's door and "put his foot out." The bag of marijuana was on Gough's lap. The victim and the Appellant introduced themselves, and the Appellant "quoted him a price." Their conversation became "heated" and "turned into a dispute." The Appellant "quoted another price," and the victim "started to get irritated." The victim "reached down" and said, "'You all don't know who you all are messing with.'" The Appellant said that the victim "grabbed the gun" and that "it was on." The Appellant fired one shot at the victim. Gough had the bag of marijuana, and Gough and the Appellant got back into Charger. Gough told the Appellant, "'I don't know what all to tell Tragic.'" The Appellant did not know who Tragic was. Bryant dropped off the Appellant where Bryant had picked up the Appellant earlier. The Appellant said that he never touched the victim's marijuana, that he never went to Raylonde's apartment on December 22 or 23, and that the case never involved a robbery.

The Appellant testified that he went to Chicago on December 24 because he thought he "needed to . . . get away from here and just try to get some money to get a lawyer to try to explain what really happened, instead of just going to jail for somebody saying that I killed this guy." The Appellant told his sister, "Man, some dude got killed and these two guys that I'm messing with got caught for it. They saying he got robbed and I killed him." The Appellant admitted to his sister that he killed the victim, but he did not say anything to her about robbing the victim. His sister "misinterpreted" what he said. People began posting threats to the Appellant and his family on his Facebook page. The Appellant said

that the posts "kind of pushed [me] over the edge" and that he decided to respond "to try to antagonize these people just as much as they was antagonizing me."

The Appellant acknowledged that he contacted Raylonde after the shooting. The Appellant wanted Raylonde "to get in contact with [Gough] and let him know that he needed to tell these people the truth." The Appellant was not trying to get Gough to lie for him.

On cross-examination, the Appellant testified that when the victim reached for the victim's gun, the Appellant pulled out his own gun, pointed it at the victim, and pulled the trigger. The Appellant was standing above and to the side of the victim, and the victim's hand was on the victim's gun at the time of the shooting. The Appellant acknowledged telling Sergeant Ewing that he was in Chicago at the time of the victim's death and that he did not explain to Sergeant Ewing what happened. He also acknowledged that soon after the victim's death, he posted messages on Facebook about having "loud" for sale.

On redirect examination, defense counsel asked the victim, "And where did the marijuana that you were trying to sell on Facebook come from?" The Appellant answered, "I got it, along with the weed that I had, from my prior transactions. I got more from him that night, before I pulled up and went home." The Appellant said that the defendants never planned to take the victim's marijuana without paying for it.

At the conclusion of the proof, the jury convicted the Appellant as charged of first degree felony murder and aggravated robbery, a Class B felony. After a sentencing hearing, the trial court sentenced him to consecutive terms of life and nine years, respectively.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant acknowledges that he shot the victim but contends that the evidence is insufficient to support his convictions because the proof fails to show that he shot the victim during a robbery. In support of his argument, the Appellant asserts that Gough, "an admitted liar," was the only witness who testified about a robbery, that the codefendants "avoided life sentences by conforming their testimony to the State's theory of the case," and that the proof shows he defended himself when the victim reached for the victim's gun. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the

light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. <u>Id.</u> Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting <u>Marable v. State</u>, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree felony murder in this case is the "killing of another committed in the perpetration of . . . any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction . . . except the intent to commit the [underlying felony]." Tenn. Code Ann. § 39-13-202(b). The trial court instructed the jury on the underlying felony of aggravated robbery. Relevant to this case, aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" and accomplished with a deadly weapon or where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401(a), -403(a).

Taken in the light most favorable to the State, the evidence shows that Gough arranged to buy marijuana from the victim. Prior to the transaction, Bryant and Gough picked up the Appellant. The three defendants then met the victim at the Circle K and, at the victim's request, followed him to his apartment complex. Bryant parked the Charger beside the victim's Hyundai, and Gough got into the front passenger seat of the victim's car to conduct the transaction. At some point, the Appellant got out of the Charger and went to the driver's side of the Hyundai. Gough testified that the Appellant, on his own

accord, shot the victim during the drug buy and took the victim's marijuana. Gough also testified that the victim never reached for the victim's gun. Bryant testified that only a drug transaction was supposed to occur, that he heard a gunshot, and that he saw the Appellant holding the bag of marijuana when the Appellant ran back to the Charger. Bryant acknowledged telling the police that Gough was holding the bag after the shooting. While all three of the defendants testified that they did not plan to rob the victim, the Appellant's own sister testified that the Appellant said they planned a robbery. Moreover, although the Appellant testified that he was "running low" on marijuana before the shooting and that he did not touch the victim's marijuana after the shooting, he announced via messages on Facebook that he had a "new shipment" of marijuana for sale just thirty minutes after the victim's death. The jury, as was its prerogative, obviously accredited the testimony of at least some of the State's witnesses and resolved any inconsistencies as to whether the robbery was planned, either by the defendants or the Appellant alone, in favor of the State. Therefore, we conclude that the evidence is sufficient to support the convictions.

### B. Cellular Telephone and Facebook

The Appellant claims that the trial court erred by allowing the State to introduce evidence from a cellular telephone and a Facebook account because the evidence was not admissible pursuant to Tennessee Rules of Evidence 403 and 901. The State argues that the trial court did not abuse its discretion by admitting the evidence. We agree with the State.

The record contains search warrants for four cellular telephone numbers, including telephone number (xxx) xxx-7463, and a search warrant for the Facebook account of "Delo Berry." In the affidavits attached to the search warrants, Sergeant Ewing set out the facts of the shooting and stated as follows: During an interview with Gough, Gough explained "Delo's" involvement. Gough consented to a search of his cellular telephone. The search revealed communications between Gough and the victim and Gough and "Delo" before the shooting. The telephone number listed for "Delo" in Gough's telephone was (xxx) xxx-7463. The police showed a photograph of the Appellant to Gough, and Gough confirmed that the Appellant was "Delo." On December 28, 2016, Sergeant Ewing observed screen shot images that appeared to show Facebook messages posted by "Delo Berry." The messages also appeared to reference the victim's "homicide" and appeared to "taunt" the victim's friends and family. The Facebook account showed a profile picture that appeared to be the Appellant.

On June 6, 2018, the Appellant filed a motion in limine, requesting that the trial court prohibit any evidence associated with telephone number (xxx) xxx-7463 and the Facebook account of "Delo Berry" pursuant to Tennessee Rules of Evidence 403 and 901. Regarding the telephone, the Appellant asserted that the records obtained by the police

showed that the telephone was registered to Esmine Reese, not the Appellant. Regarding the Facebook account, the Appellant asserted that "the State has failed to authenticate that any statements included in the Facebook records it seeks to introduce were, in fact, statements made by Mr. Berry."

During a hearing on the motion, defense counsel advised the trial court that "there are around five hundred pages worth of [F]acebook records, and I'm not sure how many pages of [telephone] texts." Defense counsel presented a copy of the T-Mobile records for telephone number (xxx) xxx-7463 to the trial court, and the trial court admitted the records into evidence as an exhibit. The State acknowledged that the telephone records showed that the telephone number was registered to Esmine Reese. However, the State advised the trial court that it had been unable to locate Reese and that "[w]e don't know that she even exists for that matter." The State also advised the trial court that it was not going to use the T-Mobile records to show that the telephone at issue belonged to the Appellant; instead, the State was going to use "the cell phone connections to all the different individuals" to show that the telephone belonged to the Appellant. As an example, the State noted that telephone number (xxx) xxx-7463 was listed in Gough's telephone under the Appellant's nickname, "Delo," and that Gough would testify at trial that he used that telephone number to contact the Appellant. As to the Facebook account, the State advised the trial court that marijuana was stolen during the shooting, that "Delo Berry" posted soon after the shooting that he was selling marijuana, and that Delo Berry said he could be contacted at telephone number (xxx) xxx-7463.

No witnesses testified at the hearing. At the conclusion of the hearing, the trial court stated that "it is not uncommon for text messages and cell phone records . . . for those to be generated by individuals other than that person to whom the cell phone is listed as being the registered owner." The trial court stated that the admissibility of the Facebook records was "a little different in that . . . there is always the possibility that a [F]acebook post is as a result of a hack" but that the defense could make that argument at trial. The trial court found that the text and Facebook messages had "probative value" and concluded that they should not be excluded under Tennessee Rule of Evidence 403.

Tennessee Rule of Evidence 403 provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996). One method of authentication is testimony by a witness with knowledge "that a matter is what it is claimed

to be." Tenn. R. Evid. 901(b)(1). Whether evidence has been sufficiently authenticated is within the trial court's sound discretion, and its decision will not be overturned absent an abuse of discretion. See State v. Mickens, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003).

At trial, Marqus Bryant testified that he knew the Appellant as "Delo." Raylonde Bryant, the Appellant's cousin, also knew the Appellant as "Delo." Robert Gough testified that he had known the Appellant about six months at the time of the shooting and that he communicated with the Appellant by cellular telephone. Gough said that the Appellant was listed in Gough's telephone as "Delo," and Gough identified the Appellant's telephone number as xxx-xxx-7463. Sergeant Beebe testified that he searched Gough's telephone and found text messages exchanged between Gough and the victim and exchanged between Gough and "Delo" before the shooting. The text messages exchanged between Gough and the victim occurred about the same time as the text messages exchanged between Gough and Delo and appeared to relate to a drug transaction Gough was arranging with the victim. The Appellant's sister testified that the Appellant came to visit her in Chicago after the shooting. Christie Wixson testified that she analyzed the cellular telephone activity for telephone number (xxx) xxx-7463; the telephone was in Clarksville on the afternoon of December 24 but was in Chicago on the morning of December 25. Therefore, we conclude that the State authenticated the telephone as belonging to the Appellant. Moreover, the text messages sent before and after the shooting were probative to the State's case. Thus, we also conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice and that the trial court did not err by admitting the text messages from the telephone into evidence.

As to the Facebook messages, in State v. Jabriel Linzy, No. E2016-01052-CCA-R3-CD, 2017 WL 3575871 (Tenn. Crim. App. at Knoxville, Aug. 18, 2017), the State sought to introduce messages found on Facebook and Twitter. Id. at *13. The messages reflected that the defendant and the victim were members of rival gangs and that the defendant had issued threats against the victim. Id. at *13. The defendant argued that the comments could not be attributed to him; in other words, the comments could not be authenticated. Id. at *11. This court stated that "evidence from social media and emails was authenticated when the prosecution offered corroborating circumstantial evidence." Id. at *12. The corroborating circumstantial evidence consisted of a witness who knew the defendant's Twitter account, a witness who knew the victim's Twitter account, and witnesses who had seen certain photographs on the defendant's and the victim's Facebook pages. Id. at *13. However, we cautioned that "'[t]o the extent that the [d]efendant argues that the State was required to affirmatively prove that the [d]efendant was the author of the message, we agree with reasoning from other jurisdictions that such challenge goes to the weight of the evidence, not its admissibility.'" Id. at *12 (quoting State v. Vermaine M. Burns, No. M2014-00357-CCA-R3-CD, 2015 WL 2105543, at *12 (Tenn. Crim. App. at Nashville, May 5, 2015)).

Elaine Bryant, the Appellant's cousin, testified under subpoena that the Appellant was her Facebook "friend" and that she "could read what he wrote and what people wrote on his page." She stated that she saw "some stuff on his [Facebook] page" related to the shooting and that she saw the Appellant "arguing with people, saying, 'Oh, well, it ain't my fault. He's dead now. What you want me to do,' etcetera, etcetera." Ms. Bryant said she recognized the Appellant's Facebook messages because his photograph was on his messages. At that point in Ms. Bryant's testimony, the State showed her a document. Ms. Bryant identified the document as a "snapshot" of a message posted by "Delo Berry," who was the Appellant. She said she recognized the message as posted by the Appellant because "[t]hat's his Facebook name" and because his photograph was on the message. She stated, "Yes, that's his page and that's his face." Wixson testified that she analyzed the Facebook records for "Delo Berry" that were obtained from Sergeant Ewing's search warrant. The messages advertised marijuana for sale and were posted soon after the defendants took two ounces of marijuana from the victim. Therefore, we conclude that there was ample evidence to authenticate the messages. Moreover, the evidence was probative to the State's theory that the Appellant planned to rob the victim. Accordingly, we agree with the trial court that the probative value of the evidence was not substantially outweighed by the danger of its prejudicial effect. The Appellant is not entitled to relief on this issue.

## C. Rifle

Next, the Appellant contends that the trial court should have declared a mistrial when Gough sua sponte testified that the Appellant had an assault rifle at the time of the shooting. The Appellant claims that Gough's "surprise testimony" about the rifle was never mentioned in discovery and "constitutes an inherently improper 'trial by ambush.'" The Appellant acknowledges that defense counsel did not object to Gough's testimony or move for a mistrial and requests that we review this issue for plain error. The State contends that the Appellant cannot show that an unequivocal rule of law was breached because Gough referred to the rifle as an "A.R. .22 rifle," not an "A.R. .22 assault rifle." The State also contends that the Appellant cannot establish that defense counsel did not waive an objection to Gough's testimony for tactical reasons. We conclude that the Appellant has failed to establish plain error.

Gough testified that after he got into the victim's car to buy marijuana from the victim, the Appellant walked to the driver's side window, tapped on the window with "[a]n A.R. .22 rifle," and started to rob the victim. The victim told the Appellant to take the marijuana, but the Appellant pointed the rifle at the victim and pulled the trigger. The rifle did not fire, so the Appellant threw down the gun, pulled out "his little .380," and shot the victim. Defense counsel did not object to Gough's testimony about the rifle or request a mistrial.

- 19 -

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). Because the Appellant failed to object at trial or request a mistrial, we can only consider the issue for plain error. See State v. Vance, 596 S.W.3d 229, 253 (Tenn. 2020) (stating that "[t]he clear implication of [Tennessee Rule of Evidence] 103(d) is that evidentiary objections not brought to the trial court's attention at the appropriate time will not be considered under plenary review"). Before plain error may be recognized, the error must be "an especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings." State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994); see also Tenn. R. App. P. 36(b). In Adkisson, this court listed the following factors to be considered in determining whether to address plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the issue is necessary to do substantial justice. Id. at 641-42.

We note that "[t]he rules concerning discovery were promulgated to allow the parties to ascertain relevant facts pertaining to their case, thus narrowing the issues in order to reach a decision on the merits without 'trial by ambush.'" Austin v. City of Memphis, 684 S.W.2d 624, 632 (Tenn. Ct. App. 1984)). In this case, though, the Appellant received Gough's police interview during discovery, and nothing indicates that Gough ever told the police about the Appellant's having any kind of rifle on the night of the shooting or that the State was aware of such evidence. Therefore, the Appellant has failed to show that an unequivocal rule of law was breached.

Moreover, defense counsel cross-examined Gough about his failure to tell the police that the Appellant's had the rifle and used Gough's failure to mention the rifle previously during defense counsel's closing argument. Specifically, defense counsel argued to the jury as follows:

Just yesterday, [Mr. Gough] added new details to his story. You heard him. He admitted on the stand that he had never mentioned before an A.R. 22 rifle. That was the first that any of us had heard of that. And then he said that Mr. Berry was present at Raylonde's house that evening.

And not even an hour later, Raylonde Bryant got on the stand and said, "Mr. Berry was never there."

- 20 -

> If Mr. Gough can't get his story straight about little details that don't really matter, why can we believe him about the big ones that do?

Thus, we agree with the State that the Appellant also has failed to show that he did not waive the issue for tactical reasons. The Appellant is not entitled to plain error relief.

### D. Excessive Sentence

Finally, the Appellant claims that his sentence of life plus nine years is excessive because the trial court erred by ordering consecutive sentencing. The State argues that the trial court properly ordered consecutive sentencing. We agree with the State.

At the Appellant's sentencing hearing, Barbara Gordon, the victim's mother, testified that the victim was twenty-three years old at the time of his death and that he had a daughter, who was seven years old at the time of the sentencing hearing. Ms. Gordon described the victim as "a good boy," "a good son," and "an awesome baseball player." She said that the victim's father and grandparents raised him and that "[t]hey did an awesome job." The victim was very respectful, loved his family, and served in the United States Army for almost three years. Ms. Gordon said that the victim's death "turned [her] world upside down" and that she suffered from anxiety, depression, and panic attacks. His death also affected her relationship with her two other children because she was "constantly crying and letting them see that." Ms. Gordon stated that the Appellant should spend the rest of his life in prison.

Frederick Ferguson, the victim's father, testified that he raised the victim and that the victim was his best friend. He stated that his "world ended" when he learned about the victim's death and that "this cowardly act by this individual, Deangelo Berry, has ruined my life." Mr. Ferguson's father "passed" three weeks after the victim's death, and Mr. Ferguson suffered a stroke due to his depression and grief. He also "watched [the victim's mother] spiral out of control." Mr. Ferguson stated that the Appellant "should never see the outside of a prison cell ever again" and that the Appellant "is a waste and now the great citizens of Tennessee will have to pay for that waste."

The Appellant made a brief allocution in which he apologized to the victim's mother. The Appellant stated that he "didn't do this for no reason" and that "[i]t was a bad situation and the outcome of this situation just turned out to be something that everybody had to deal with in a negative way. It was nothing meant to happen the way it happened at all."

- 21 -

The State introduced the Appellant's presentence report into evidence. According to the report, the then twenty-two-year-old Appellant was expelled from school in the eighth grade "due to juvenile charges" but earned his GED in 2013. In the report, the Appellant said that he was married but estranged from his wife and that he had a three-year-old daughter by another woman. He described his physical heath as "good" and his mental health as "fair" due to "bipolar, anxiety, ADHD." The Appellant stated that he consumed his first alcoholic drink when he was ten years old and began drinking more frequently when he was fourteen years old. The Appellant stated that he began smoking marijuana when he was twelve years old and that he smoked six to seven "blunts" per day. The Appellant said that he also used Ecstasy and that he consumed about ten pills per day. The Appellant stopped using drugs when he was jailed in this case. Regarding employment, the report stated as follows:

> Defendant reported that he never worked. He hung out on the streets and made what ever money he needed there. He did not go into details other [than] to admit that he sold drug[s] when needed.
>
> . . . .
>
> Defendant reported that he has not had a job. When asked how he makes money he said he did whatever it took sometimes selling drugs. Other times the street family took care of him.

The report showed that the Appellant was adjudicated delinquent of truancy and probation violations in Chicago, and the State submitted certified copies of judgments of convictions for the following misdemeanors as an adult: theft and evading arrest in Montgomery County and failure to stop after an accident, simple possession, theft, and domestic battery in Tippecanoe County, Indiana. The Appellant was serving unsupervised probation at the time of the offenses in this case. The Appellant's Strong-R assessment concluded that he had low needs relevant to "Friends," "Attitudes/Behaviors," and "Family"; that he had moderate needs relevant to "Aggression," "Alcohol/Drug Use," "Residential," and "Education"; and that he had high needs relevant to "Employment."

The State argued that the trial court should apply certain enhancement factors and order consecutive sentencing based on the Appellant's being "a professional criminal." The State noted that the Appellant was a young man but that "his own statement in the presentence report is the only way he's earned money is by selling drugs." The State also argued that consecutive sentencing was appropriate due to the Appellant's being a dangerous offender.

The trial court applied the following enhancement factors to the Appellant's sentences: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (8) "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; and (10) "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(1), (8), (10). The trial court found that no mitigating factors were applicable and sentenced the Appellant to life for first degree murder and to nine years as a Range I, standard offender for aggravated robbery, a Class B felony. The trial court found that the Appellant was a professional criminal and a dangerous offender and ordered that he serve the nine-year sentence consecutive to the life sentence. See Tenn. Code Ann. § 40-35-15(b)(1), (4).

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. § 40-35-210(b); see also Bise, 380 S.W.3d at 697-98. Moreover, consecutive sentencing is "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (citing Tenn. Code Ann. §§ 40-35-102(1), -103(2)). The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order consecutive sentencing if the court finds by a preponderance of the evidence that "[t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood" or "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(1), (4). If the trial court finds that a defendant is a dangerous offender, the trial court must find that "(1) the sentences are necessary in order to protect the public from

further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Trial courts must make specific findings regarding these Wilkerson factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In ordering consecutive sentencing, the trial court stated as follows:

[T]he presentence report reflects that the Defendant has never held a job. When he needs money, he would sell some weed. Therefore, I find that sub-section (1), that the Defendant is a professional criminal who has knowingly devoted the Defendant's life to criminal acts as a major source of livelihood. I recognize he is a young man, but we have before us then is his total work life, and it involves selling drugs. Sub-section (4) provides the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Clearly, clearly, that was the circumstances in this case. Given the location of the -- I remember the trial well, given the results of the autopsy, the entrance location of the round that killed the victim; therefore, I am going to order that the sentence in Count Two, aggravated robbery, will run consecutive to the life sentence in Count One.

The Appellant contends that the trial court's finding him to be a professional criminal was "weak on substance and justification" and that his "small marijuana sales" did not "automatically equate" him to being a professional criminal. The Appellant also contends that in classifying him as a dangerous offender, the trial court failed to address the Wilkerson factors.

We conclude that the trial court did not abuse its discretion by ordering consecutive sentencing based upon the Appellant's being a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood. Granted, the Appellant was a young man at the time of the crimes and at the time of sentencing, just twenty and twenty-two years old, respectively. However, the Appellant, who was married and had a young child, admitted that he had never held a job, that he "hung out on the streets," and that he "sold drug[s] when needed." This court has held that similar admissions by a young defendant supported a trial court's conclusion that the defendant knowingly devoted his life to criminal activity as a major source of livelihood. See State v. Christopher Lee Davis, No. M2012-01546-CCA-R3-CD, 2013 WL 3808209, at *8 (Tenn. Crim. App. at Nashville, July 18, 2013) (stating that trial court did not err by ordering consecutive sentencing when defendant, who was nineteen years old at the time of the crimes, admitted that he had never held a job and had sold drugs "to get by"). A trial

court may impose consecutive sentencing after finding any one of the factors listed in Tennessee Code Annotated section 40-35-115(b).  Id.  Therefore, because the trial court's order of consecutive sentencing did not hinge solely on the dangerous offender criteria, the trial court's failure to address the Wilkerson factors was harmless error.  See Tenn. R. App. P. 36(b).

### III.  Conclusion

Based upon the record and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE